## LAWSON A. WINSLOW

*v.*

### SHERMAN LELAND, Admr. *et al.*

*Filed at Ottawa May 16, 1889.*

1. ASSIGNMENT OF A JUDGMENT—*subject to what defenses.* Judgments and decrees are not commercial paper, and assignees of such securities take them affected with all equities and defenses which might have been set up against them in the hands of the assignor. After a contract for the discharge of a judgment, and while such contract is in process of execution, the owner thereof can not, by an assignment of the same, divest or defeat the right of the debtor to a discharge under his contract, and on performance by the debtor the judgment will be satisfied as to him.

2. SAME—*whether a satisfaction—the circumstances considered.* Where judgments against two partners are taken up by a son of one of them, the fact that the son, as assignee thereof, claims to have the other partner charged with his proportionate share of the money actually paid for the transfer of the judgments, instead of the full amount due thereon, is a circumstance tending strongly to show that the judgments were taken up in the interest and for the benefit of the father.

3. And where the son purchases the judgments and takes an assignment thereof, if, in the subsequent adjustment of accounts between him and his father the former receives credit from the latter for all the moneys expended by him in their purchase, his interest in the judgments will be precisely the same as though the purchases had been originally made by his father with his own money and for his own benefit, and neither the son nor his assignee can collect such judgments of the father, or from his estate.

4. In this case, a son of one of two partners, after the purchase of certain judgments against the partners, agreed with the other partner to purchase his interest in the assets of the firm, and to pay him a price to be fixed by arbitrators, such partner to be charged with his share of the firm liabilities in fixing the price to be paid, and the son further agreed to assume the partner's share of such liabilities, and to save him harmless therefrom. It was *held,* that the agreement to keep such partner harmless from his share of the firm liabilities, including the judgments so held by the son, even if bought with his own money, operated between them as a satisfaction and discharge of the judgments, and being a discharge of one partner, it was equally so as to the other partner or joint debtor.

5.  If the assignee of a judgment against two persons agrees with one of them to save and keep him harmless from liability thereon, this will operate as a satisfaction of the judgment as to both debtors, and neither the holder of such judgment nor his subsequent assignee will, in equity, be allowed to enforce the collection of the same, and such judgment can not form the basis of a creditor's bill as against the estate of the other joint debtor. The satisfaction of a judgment as to one joint debtor is a satisfaction as to both.

6.  CREDITOR'S BILL—*prerequisites—and herein, in case of the death of the judgment debtor.* A money decree in a court of equity stands upon the same footing as a judgment at law, in respect to a creditor's bill. An execution thereon must be issued, and returned no property found.

7.  It is a general rule, subject to a very few exceptions, that before a bill can be filed to reach equitable assets, the creditor must first recover a judgment at law,—or what, in a proper case, would be its equivalent, a money decree in equity,—and have an execution issued, and returned unsatisfied.

8.  By the death of a judgment debtor, remedies which might have been pursued in his lifetime are extinguished, and a new class of legal rights and remedies is created. His personal estate is no longer liable to sale on execution, but creditors are given the right, upon exhibiting and establishing their claims in the county court, to share in the distribution of his estate.

9.  Not only is it true that when a debtor dies the law gives new legal remedies against the representatives, but the rule is imperative, that to entitle a creditor to share in the distribution of his estate, those remedies must be pursued. The creditor must exhibit and prove his claim in the court before he can be entitled to payment. In this respect judgment creditors, except so far as their judgments are liens on real estate, and simple contract creditors, stand upon the same footing.

10.  The mere fact that a creditor has exhausted his legal remedies against his debtor while living, does not furnish a sufficient ground for proceeding, by creditor's bill, to reach personal estate while the administration of the estate of the debtor is in progress, especially when no fraud is charged against the intestate, and the only scope of the bill is to seek a remedy against the fraud or failure of duty of the administrator himself, and to reach property which the administrator is entitled to, but which he has failed to get into his possession.

11.  By the statute, claims against estates of deceased persons are to be classified, and some may be paid in full and others *pro rata,* and a claimant can not avoid this statute by resorting to equity. A court of equity will not ordinarily assume jurisdiction until the claimant shall have exhibited his claim and had it allowed in the county court, and

20—128 ILL.

then, if any special reasons that may be deemed sufficient can be assigned why that court can not afford the requisite relief, equity will assist him, but not otherwise.

12. Same—*as to judgment in United States Court.* A judgment in the United States Court, that being a court of another jurisdiction, can not be made the basis of a creditor's bill in a State court.

13. Administration of estates—*in chancery—powers of the county court—how far exclusive.* A court of chancery may, in the exercise of its general jurisdiction, take upon itself the administration of an estate. But this will be done only in extraordinary cases; and when it does, it will take the whole administration, and not merely a part of it. The fact that the administrator has, through negligence or fraud, failed to find and collect assets in the hands of surviving partners of the intestate, is not a sufficient ground for the interposition of a court of equity. In such a case, the remedy is within the powers of the county court.

14. The county court has ample power to compel an administrator to proceed properly and faithfully in the discharge of his duties. If he makes mistakes, it has power to correct them. If he has been guilty of fraud, or has wasted the estate, or has shown himself incompetent or an improper person to conduct the administration, the court has power to call him to account, or to remove him and appoint another and suitable person in his place.

15. The remedy by which the creditors of an intestate may subject the personal estate of their deceased debtor to the payment of their claims, is by due course of administration. As to all personal assets which are legally within the reach of the administrator, and upon which the creditor has obtained no lien during the lifetime of his debtor, this remedy is exclusive. All personal assets as to which the intestate was himself in a position to assert title at the time of his decease, pass to the administrator, and it is through him alone that the creditors must seek to have them subjected to the payment of their debts.

16. Same—*abandonment or release of claim.* A covenant or agreement by a creditor of an estate with the widow and heirs, that all proceedings for the collection of his debt through the instrumentality of the administration shall be abandoned, that the estate may be finally settled and final distribution made, wholly discharged of his claim, and releasing and relinquishing to the widow and heirs of the intestate any claim he may have to share in such distribution, is in effect a complete abandonment and release of all legal claim to have his debt satisfied out of any personal estate which the administrator has reduced to possession, or to which he is entitled as administrator.

17. In such case, it can not avail the creditor that a reservation was made in the contract of release, of the right, by other proceedings then pending or thereafter to be instituted, to enforce the collection of his

claim out of that of the intestate in the assets of certain firms of which the intestate was a member at his death. That interest could be reached by the creditor by due course of administration, and not otherwise, and therefore such reservation is nugatory.

18. SAME—*on the death of a partner—assignable interest of distributees.* On the death of a partner, all rights and causes of action growing out of his dealings with the firms of which he was a member, and the right to an accounting with the surviving members of such firms, are by law vested in his administrator, and not in his widow and children, and they can not transfer to a third person the right to call on such surviving members for an accounting.

19. The widow and heirs of an intestate have an assignable interest in their distributive share of the assets of the estate after the payment of debts; but that interest is wholly distinct from an interest in specific chattels upon which no administration has been had. As to the latter, they have no interest susceptible of assignment, the entire ownership, for all the purposes of administration, being vested in the administrator.

20. LACHES—*delay in attacking an accounting and settlement between surviving partners and the administrator of deceased partner.* An unexplained delay of nearly six years after the settlement of a partnership between the surviving members and the administrator of a deceased partner, during which time one of the surviving partners has died and the situation of the others has materially changed, and more or less of the evidence by which the true state of the accounts of the firm could be established has disappeared, will constitute such *laches* as will bar the widow and heirs of the deceased partner, and their assignee, of their right to attack such accounting and settlement as fraudulent and collusive.

21. SUPPLEMENTAL BILL—*in chancery.* Where a supplemental bill is filed setting up a supposed interest acquired *pendente lite,* and it appears from such bill that the assignment relied on passed no interest to the complainant capable of being asserted either at law or in equity, it will be subject to demurrer. In such case, the complainant will have no newly acquired interest which can be the basis of such a bill.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. GWYNN GARNETT, Judge, presiding.

This was a bill, in the nature of a creditor's bill, brought by Lawson A. Winslow against Sherman Leland, administrator of the estate of William H. W. Cushman, deceased, Anna C. Cushman his widow, William H. Cushman, Susan C. Dickey,

Anna O. Glover and Mabel M. Cushman, his children, Nellie Driver, formerly Nellie Cushman, the widow and administratrix of a deceased son, Ralph Plumb, Francis E. Hinckley, Philip B. Shumway and Isaac N. Hardin, and the administrators of the estate of David Strawn, deceased. During the pendency of the suit Philip B. Shumway died, and his administrators were made parties defendant. The original bill was filed August 22, 1882, and an amended bill was filed December 29, 1882. By agreement of the parties the original bill, and all answers, demurrers, orders and other papers pertaining thereto are omitted from the transcript of the record, and the transcript is thus made to commence with the amended bill.

Issues were formed upon the amended bill by answers and replications. On the 20th day of April, 1887, the complainant filed a supplemental bill to which a demurrer was sustained. On the 25th day of the same month he filed an amendment to his amended bill which was duly answered. On the 27th day of April, 1887, Nellie Driver, as administratrix of her deceased husband George H. N. Cushman, filed her cross-bill, which was answered, and on the 24th day of October, 1887, a cross-bill was filed by Anna C. Cushman, Anna O. Glover, Susan C. Dickey and Mabel M. Cushman, to which certain pleas were interposed, and the cause coming on to be heard on pleadings and proofs, a decree was rendered dismissing the bill and cross-bills for want of equity, at the cost of the complainants therein. This decree was affirmed by the Appellate Court on appeal, and by appeal from the judgment of that court the record is brought here for review.

The bill was filed to enforce the collection of nine judgments at law and one decree in chancery, recovered by various parties, and which the complainant claims to hold and own by virtue of certain assignments thereof to him. The names of the several plaintiffs and the dates and amounts of the judgments and decree are as follows:

John R. Adams, Nov. 5, 1874, - - - - - - $1,775.34
Rosenfeld & Rosenberg, Nov. 6, 1874, - - - . 3,235.28
Salome Hathaway, Jan. 27, 1875, - - - - - 2,388.00
Elnathan P. Hathaway, Jan. 27, 1875, - - - 2,390.00
National Bank of Illinois, March 25, 1875, - - 2,960.02
John E. Owsley, April 28, 1875, - - - - - 4,142.00
William M. Derby, July 7, 1875, - - - - - 2,172.28
National City Bank of Ottawa, July 1, 1876, - 5,797.81
George Chandler, Receiver, Nov. 20, 1876, - - 148,480.00
Commercial Nat. Bank of Chicago, Dec. 18, 1876, 5,607.05

Five of these judgments, viz, those in favor of the following plaintiffs, Salome Hathaway, Elnathan P. Hathaway, the National Bank of Illinois, the National City Bank of Ottawa and the Commercial National Bank of Chicago, were recovered in the Circuit Court of the United States for the Northern District of Illinois. The other four judgments and the decree in favor of Chandler, receiver, were recovered in the Superior Court of Cook county. Executions were duly issued upon all of said judgments and returned unsatisfied, except the judgment in favor of the Commercial National Bank of Chicago, but neither upon that nor upon the decree does any execution appear to have been issued. The judgment in favor of the National City Bank of Ottawa and the one in favor of the Commercial National Bank of Chicago were recovered against William H. W. Cushman alone. Those in favor of Salome Hathaway and Elnathan P. Hathaway were recovered against Cushman, Isaac N. Hardin and Seth W. Hardin, the residue of the judgments and the decree being against Cushman and Isaac N. Hardin.

For years prior to 1871 Cushman was a resident of Ottawa, Illinois, and was a man of large wealth. He had long been engaged in business there as a banker and otherwise, and he was also engaged in the banking business in Chicago as a partner with Isaac N. Hardin under the firm name of Cushman & Hardin, Cushman's interest in the firm being one-third

and Hardin's two-thirds. Cushman and Hardin were also members of the lumber firm of Cushman, Calkins & Co., doing business at Manistee, Michigan, Cushman's interest in that firm being one-sixth and Hardin's one-third. They were also largely interested in real estate and other business enterprises in Chicago. The property of the lumber concern was destroyed by fire the same night of the great Chicago fire in October, 1871. Owing to the loss thus sustained, and perhaps to losses resulting from the great fire in Chicago and from the panic of 1873, and also owing to Cushman's becoming involved in railroad matters as hereinafter mentioned, the business enterprises in which Cushman and Hardin were jointly interested became greatly embarrassed. As a result, numerous suits were brought against them for indebtedness growing out of their business, which suits resulted in the judgments and decree in question, and other judgments not now in controversy.

At that time William H. Cushman, a son of William H. W. Cushman, was engaged in extensive business operations in Colorado, including banking and various mining ventures, his father being to a greater or less degree interested with him in such business. Among other things, he was the owner and president of the First National Bank of Georgetown, Colorado. The business interests of William H. Cushman were so far involved with those of his father, and indirectly with those of Cushman & Hardin, that the suits and judgments against the latter became embarrassing to him. An arrangement was thereupon entered into between him and his father by which the judgments when recovered were to be bought up and assigned to him. In pursuance of this arrangement the judgments and decree described in the complainant's bill were bought in, the actual negotiations in relation to such purchases being carried on in part by William H. Cushman and in part by his father. The judgments were bought substantially at their face, but the assignment of the decree was obtained at a large discount. They were all assigned in due form to William H. Cushman.

The question as to whose money was used in making said purchases is in dispute, the complainant claiming that William H. Cushman bought the judgments and decree with his own money and for his own benefit, while the defendants claim that the money used was in fact the money of his father. On this question the evidence is conflicting to this extent: The testimony of William H. W. Cushman taken October 11, 1877, in a proceeding before arbitrators which will be mentioned presently, was read at the hearing, in which he testified, in substance, that his son frequently furnished him with money to enable him to protect himself against these judgments, and that he used said money in taking up said judgments, and to secure his son for the advances, he had the judgments assigned to him; that said advances were not made by his son to him as a matter of personal accommodation upon a general account between his son and himself. William H. Cushman also in his testimony in the same arbitration proceeding, on being asked how he came to send money to his father to purchase these judgments, answered: "I don't know whether I was here in Chicago or whether it was in Colorado I received a letter from my father in which I was informed there had been certain judgments entered. They were annoying him greatly, levying upon his property and making a great deal of trouble, and I do not remember whether I arranged and purchased the first myself or whether I sent the money to him, but I know at different times I have sent him money; at other times I have authorized him to draw upon me for money to take up certain judgments and have them assigned to me. I always instructed him to have the judgments assigned to me. I furnished the money, but it was for my benefit." In a subsequent deposition, however, William H. Cushman testified, in substance, that his father procured the greater part of the assignments of the judgments and he procured the residue; that said assignments were procured for his father's benefit; that in some instances his father furnished the money and in others he

did; that he was indebted to his father at the time in various amounts, sometimes to a very large amount, there being a running account between them; that he understood that he was taking up the judgments for his father's benefit, and not to use for the purpose of enforcing them against his father's property; *that he received in his account with his father credit for whatever sums he paid in taking them up.*

Hardin being unable to obtain a settlement with Cushman of the co-partnership business of the firm of Cushman & Hardin, filed his bill against him in the Superior Court of Cook county for an accounting. While that suit was pending, an agreement was entered into between Hardin and Cushman, bearing date December 30, 1876, by which they agreed to submit all matters of difference between them growing out of their personal accounts with each other and with said firm, and all personal claims and counter-claims between them of every description growing out of their partnership agreement and partnership dealings, for adjustment and award, to Daniel L. Shorey of Chicago, said Shorey to determine the matters between said parties, but without taking into account any of the assets of said firm; and it was agreed that his award should be reduced to writing, and should be binding and conclusive between the parties.

On the same day the foregoing instrument was executed, an agreement was entered into between Hardin and William H. Cushman, by which the latter agreed to purchase and the former to sell all the right, title and interest of Hardin in and to the property and assets of every description of the firm of Cushman, Calkins & Co., and of the firm of Cushman & Hardin, on the following terms: The price to be paid for Hardin's interest in the property and assets of the firm of Cushman, Calkins & Co. was to be fixed and determined by the appraisal of two disinterested practical lumbermen, acquainted with the value of the property at the place where the property of said firm was situated, one of the appraisers to be chosen by each

party, the two to choose a third in case of disagreement, the decision of such appraisers or of any two of them to be binding and conclusive between the parties; and it was provided that, in determining the value of said interest, the appraisers should consider the property and assets of the firm of every kind and description, and all the debts and liabilities of the firm. And it was further provided that the interest of Hardin in the property and assets of the firm of Cushman & Hardin should be fixed and determined in like manner by appraisers, such appraisers to be disinterested practical business men owning property and doing business in the city of Chicago; that the last mentioned appraisers, after determining the value of the property of Cushman & Hardin and Hardin's interest in the same, should add thereto the value of his interest in the assets of the firm of Cushman, Calkins & Co. as the same should be found by the appraisers first above mentioned, and that from the amount thus ascertained, they should deduct Hardin's proportion of all outstanding liabilities of the firm of Cushman & Hardin; that in the mode above provided, the appraisers should fix and determine the amount to be paid to Hardin by William H. Cushman, and also that they should fix the terms of payment, and that their award in that behalf should be binding upon both parties. It was further provided that the award of Daniel L. Shorey in respect to the matters submitted to him in the agreement between Hardin and William H. W. Cushman above mentioned should be certified to the arbitrators appointed to appraise the interest of Hardin in the firm of Cushman & Hardin, and that such award should be received and acted upon by the arbitrators as final and conclusive of all matters submitted to and considered by said Shorey.

It was further agreed that, upon payment by William H. Cushman to Hardin of the amount to be thus fixed by the arbitrators, Cushman should be vested with all of Hardin's interest in the property and assets of both firms, subject to

the debts and liabilities of said firms, Cushman agreeing to assume Hardin's share of said liabilities, and to save Hardin harmless therefrom, and Hardin agreed on his part to execute to Cushman proper deeds, bills of sale and other papers, so as to fully vest in Cushman, his heirs and assigns, his, Hardin's interest in all of said property. And it was provided that if Cushman should for sixty days after the award of said arbitrators, neglect or refuse to pay the purchase money or execute and deliver the notes therefor as provided by said arbitrators, the whole amount awarded by the arbitrators should become at once due and payable, and Hardin might cause judgment to be entered up in any court of record for the full amount of the purchase price fixed and determined by the arbitrators, and for that purpose, authority was given to any attorney of any court of record to appear for said Cushman and confess judgment for the amount so awarded. And it was in said agreement declared that the purpose of said submission and arrangement was, to effect an amicable and final adjustment of all matters of difference between said Hardin and William H. W. Cushman, and to bring to an end all litigation then pending between them, by a sale to said William H. Cushman of the interest of Hardin in all the property in which said William H. W. Cushman and said Hardin were then jointly interested.

A third agreement supplementary to the two agreements above set forth was executed by Hardin, William H. Cushman and William H. W. Cushman, in which it was agreed that Shorey's award, when completed, should be furnished to the arbitrators to be appointed under the agreement between Hardin and William H. Cushman, and that said arbitrators should receive said award and be governed thereby, and that in case any amount should be found by said Shorey to be due from Hardin to William H. W. Cushman, and the same should be allowed by the arbitrators in their award of the amount to be paid by William H. Cushman to Hardin, William H. Cushman

should assume Hardin's liability to William H. W. Cushman upon the Shorey award, and William H. W. Cushman should accept such liability in full discharge of Hardin therefrom.

Shorey made his award in relation to the matters submitted to him, finding a balance due from Hardin to William H. W. Cushman of $1228.31. The arbitrators appointed to appraise Hardin's interest in the assets of the firm of Cushman, Calkins & Co. made their award fixing the value of said interest at $32,450.70. The arbitrators appointed to appraise Hardin's interest in the assets of the firm of Cushman & Hardin and to strike a general balance giving the total value of his interest in all the assets pertaining to the various enterprises in which he was interested jointly with William H. W. Cushman, made their award, and in doing so, they charged Hardin with his proportion of the moneys expended by the Cushmans in the purchase of the several judgments and the decree above mentioned, and his proportion of all the indebtedness of the firm of Cushman and Hardin, and also with the amount of the Shorey award, and credited him with the amount of the award of the Michigan arbitrators as to the value of Hardin's interest in the assets of the firm of Cushman, Calkins & Co. After these various adjustments, the amount awarded as the net value of Hardin's interest in both firms was $18,465.01, and the award required William H. Cushman to pay that sum to Hardin in cash, with interest from the date of the award at the rate of ten per cent per annum.

After the foregoing agreements for arbitration were signed and while the arbitrations were in progress and before the final award, William H. Cushman assigned three of the judgments above described, viz., those in favor of Salome Hathaway, John R. Adams and Rosenfeld & Rosenberg, to the receiver of the City National Bank of Chicago, as collateral security for certain indebtedness. He also about the same time obtained a loan from Stephen V. White of New York of $55,000, and deposited with him as security for such loan, ninety thousand

shares, of the nominal value of $10 per share, of the capital stock of the Hukill Gold and Silver Mining Company of Colorado, and also, in addition to certain other collaterals, assigned to White the residue of said judgments and said decree. About the time the award was made William H. Cushman became insolvent, and consequently the amount of the award was not paid by him to Hardin. At the expiration of six months from the date of the award, Hardin caused a judgment to be entered against him in pursuance of the warrant of attorney contained in the arbitration agreement, for the amount of the award and interest. An execution having been issued on said judgment and returned unsatisfied, Hardin filed a creditor's bill against William H. Cushman, William H. W. Cushman and others, for the purpose of satisfying his judgment out of the equitable assets of his debtor.

The receiver of the City National Bank had in the meantime sold certain real property of William H. W. Cushman under a judgment in favor of Loomis & Follett which had also been assigned to him by William H. Cushman. Said receiver thereupon, for the purpose of obtaining a release of the lands thus sold from the lien or supposed lien of Hardin's creditor's bill, obtained an order of court authorizing him to assign said three judgments in consideration of such release, and in pursuance of that order, the three judgments were assigned to Lawson A. Winslow, the complainant in this case, it being now claimed that Hardin had previously assigned to him the judgment upon which the creditor's bill was based.

Cushman's loan from White was not paid at maturity, and White advertised and sold the mining stock pledged as collateral thereto, and the same was struck off for $50,000, White's agent making the bid and becoming the purchaser. After the sale White claimed, as against Hardin, that he had a right to hold the judgments and decree assigned to him, as security for the payment of the residue of the loan and interest. It appears, however, that by certain subsequent transactions, he

realized out of the mining stock enough to repay him the entire loan and more, and he accordingly notified William H. Cushman that, as against him, he would not claim to hold the judgments and decree as further security. A receiver was appointed in the matter of Hardin's creditor's bill, and said bill was afterward amended so as to make White a party defendant, and to pray that he be required to turn over to said receiver the judgments and decree in his hands. Upon a stipulation that no personal decree should be rendered against him nor any decree inconsistent with his answer, he consented to come and enter his appearance and submit himself to the jurisdiction of the court. By his answer he set up that he held said judgments and decree as security for a balance of $5000 and interest yet remaining due and unpaid on the Cushman loan, and consented to surrender them to the receiver on condition that the amount thus claimed to be due him should be first paid out of the proceeds thereof. An order was entered finding White's interest in the judgments and decree to be as alleged in his answer, and he was required to surrender them to the receiver, his priority of right to the proceeds being preserved. The judgments and decree were accordingly surrendered and assigned by White to said receiver, and afterwards they were sold by the receiver at auction, Winslow, the complainant, becoming the purchaser. The sums bid therefor were scarcely more than nominal. Thus the amount bid for the decree for $148,480 was $10; the amount bid for five of the judgments, aggregating $20,928.82, was $3 apiece or $15 in all. For two of the judgments, viz., the one in favor of Elnathan P. Hathaway and the one in favor of the National Bank of Illinois, $50 each was bid. The entire amount for which the judgments and decree were sold was $125. Said sale took place June 26, 1879, and the assignment of the three judgments to Winslow by the receiver of the City National Bank took place at about the same time.

William H. W. Cushman died intestate October 28, 1878. He left policies.of insurance on his life amounting to about $25,000, which before his death he had assigned to William H. Cushman to be held in trust for the benefit of Mrs. Anna C. Cushman, the wife of William H. W. Cushman. Hardin, by his creditor's bill, sought to subject said policies of insurance to the payment of his judgment, on the allegation that they were the property of William H. Cushman, his judgment debtor. In this he was defeated, it being decided at the hearing of his bill that William H. Cushman had no beneficial interest in the insurance money, but merely held it as trustee. Upon the decision of Hardin's case, Winslow filed a creditor's bill based upon the judgments which he had obtained by assignment, making William H. Cushman, the trustee, Anna C. Cushman, the beneficiary, the insurance company and others parties defendant, seeking thus to reach the insurance money and have it applied to the satisfaction of his judgments. Upon the hearing of this case also the decree was adverse to the complainant therein.

Letters of administration upon the estate of William H. W. Cushman were issued by the county court of La Salle county to Sherman Leland, and he duly qualified as such administrator. In December, 1880, which was less than two years after letters of administration were granted, Winslow exhibited his claim against said estate as assignee of said judgments and decree, by filing such claim in said county court. Said claim was never proved up or allowed, but remained pending until May 22, 1885, when it was dismissed by the county court on its own motion for want of prosecution.

After the adverse decision of Winslow's suit to subject the moneys payable on said insurance policies, to the payment of his judgments, the present bill was filed for the purpose of reaching and subjecting to the payment of his judgments and decree the interest of William H. W. Cushman in the Midland Construction Company, a copartnership of which he was a

member at the time of his death. The history of said copartnership, as shown by the record, is briefly as follows: In February, 1871, Ralph Plumb, Francis E. Hinckley and Philip B. Shumway formed a copartnership under the firm name of Ralph Plumb & Co., for the purpose of building the Bloomington and Ohio River Railroad, and built about thirty miles of their road, but were unable to proceed further without financial assistance. Shortly prior to this, Cushman, Plumb and David Strawn had formed a copartnership, under the firm name of D. Strawn & Co., for the purpose of building the Fairbury, Pontiac and Northwestern Railway, of which they also built about thirty miles. Cushman was then considered a man of large wealth, and the firm of Ralph Plumb & Co., being unable to proceed further, it was proposed that the two firms and the two railroad enterprises be consolidated. This proposition was carried into effect, the two firms being consolidated under the name of the Midland Construction Company, and the two railroads under the name of the Chicago and Paducah Railroad Company. It was then proposed to continue the construction of the consolidated railroad from its southern terminus to some point where it would connect with the line of the Chicago, Rock Island and Pacific Railroad.

The members of the original firms were equal partners in their respective firms, but in consolidating the two firms, the interest of Ralph Plumb & Co. was valued at six-tenths and that of D. Strawn & Co. at four-tenths. Some changes were subsequently made in the individual interests of some of the partners, and there is some controversy as to how their interests were arranged at the time of Cushman's death.

To obtain money to continue the building of the road, bonds of the consolidated railroad company were issued and negotiated to a large amount, and some contributions of cash were made by individual members of the firm. Hinckley contributed between $40,000 and $50,000, and Cushman contributed $40,000 at one time and $70,000 at another. Plumb had

already contributed about $40,000 to the construction of the Bloomington and Ohio River Railroad. Of these advances the $70,000 advanced by Cushman was secured to him by the promissory note of his copartners, and that note seems to have been outstanding and unpaid at the time of his death.

The consolidated firm proceeded with the construction of its road until it had about one hundred and sixty-five miles of road built, equipped and in operation, the northern terminus of its road being at a station known as Strawn. The road thus built failed to pay operating expenses, and the railroad company was in default in the payment of interest on its bonds. A suit was thereupon brought against said company in the Circuit Court of Effingham county in which a receiver was appointed. That suit was afterwards removed to the Circuit Court of the United States for the Southern District of Illinois, and proceedings were there instituted for the foreclosure of the deed of trust securing said bonds, for the benefit of all the bondholders. At that time the railroad company and the construction company were both practically bankrupt.

While said foreclosure proceedings were pending, the Wabash Railway Company was seeking to complete its line of railroad from St. Louis to Chicago, and negotiations were thereupon entered into looking to a transfer of the Chicago and Paducah Railroad to that company to be utilized by it as a part of its Chicago line. An agreement in furtherance of such transfer was entered into October 10, 1878, eighteen days before Cushman's death, between the Wabash Railway Company of the first part, the Decatur and State Line Railway Company of the second part, and Ralph Plumb of the third part. The Decatur and State Line Railway Company was a corporation owning a franchise to build a railroad a part of the proposed line of which extended from Strawn, the northern terminus of the Chicago and Paducah Railroad, to Bremen, a station on the line of the Chicago, Rock Island and Pacific Railway, but which had then done but little towards building any portion

of its road. Plumb, in entering into the agreement, professed to act on his own behalf as a bondholder of the Chicago and Paducah Railroad Company, and on behalf of the other bondholders of that company. It was provided by the agreement, among other things, that the Decatur and State Line Railway Company should, within a certain time, build and complete its road from Strawn to Bremen, and for that purpose, that it might issue its bonds to the amount of $14,400 per mile; that Plumb should cause the Chicago and Paducah Railroad to be sold under the foreclosure proceedings, and that said road should be bought in by himself and those in community of interest with him as bondholders; that the purchasers should organize themselves into a railway company, and when organized, should consolidate with the Decatur and State Line Railway Company; that the Wabash Railway Company should thereupon issue and deliver to trustees its bonds at the rate of $14,400 per mile for each mile of the road belonging to the consolidated company, and the consolidated company should thereupon execute and deliver to such trustee its mortgage upon its entire line of railroad to secure said bonds, such mortgage to be a first lien thereon; that the consolidated corporation should thereupon become consolidated with the Wabash Railway Company; that the holders of the bonds issued by the Decatur and State Line Railway Company might then exchange their bonds for an equal amount of the bonds of the Wabash Railway Company in the hands of said trustee, and that the holders of the bonds of the Chicago and Paducah Railroad Company might exchange their bonds for the said bonds of the Wabash Railway Company in the proportion of four of the former for three of the latter, all coupons for accrued interest on the Chicago and Paducah bonds to be detached and cancelled, and that to further secure said new bonds a certain per cent of the gross earnings of a certain portion of the Wabash Railway should be set apart as a fund for their payment. This contract was followed by a contract dated November 15, 1878,

21—128 ILL.

between various of the bondholders of the Chicago and Paducah Railroad Company, in furtherance of the scheme proposed by the preceding contract, and providing a mode in which said bondholders might avail themselves of its provisions.

The project proposed by the foregoing contracts was subsequently abandoned, and in lieu thereof a new contract was entered into between the Wabash Railway Company and Plumb, dated June 9, 1879, in which Plumb covenanted for himself and his associate bondholders, to purchase the Chicago and Paducah Railroad at the foreclosure sale, and then organize themselves into a railway corporation; and in which Plumb covenanted for himself, that he would, under the charter of the Decatur and State Line Railway Company, or under a charter procured expressly for that purpose, build a railroad upon a route to be approved by the Wabash Railway Company, from Strawn to some point at or near the Stock Yards in the city of Chicago; that the company owning said new road should thereupon become consolidated with the company then owning said Chicago and Paducah Railroad, and that the Chicago and Paducah Railroad and the extension thereof to Chicago should then be transferred to the Wabash Railway Company, and that in payment therefor the Wabash Railway Company should issue its bonds, secured by a first mortgage on the entire road, and also secured by a pledge of a certain per centage of the gross earnings of a certain portion of the Wabash Railway, to the amount of $20,000 per mile on said new road from Strawn to Chicago, and $14,400 per mile on the residue of said road, said bonds to be distributed as follows: To the holders of the bonds of the Chicago and Paducah Railroad Company in the proportion of four of the last named bonds for three of the bonds of the Wabash Railway Company, and to Plumb and his associates, bonds to the amount of $19,000 per mile of the newly constructed road, the residue of the bonds to be applied to the payment of the costs of the foreclosure suit, counsel fees, and other expenditures incident to the transfer of said property.

The last mentioned agreement was performed by the parties thereto, the Chicago and Paducah Railroad being purchased at the foreclosure sale by Plumb and his associates, the extension of said road to Chicago being built by Plumb, and the consolidated road being turned over to the Wabash Railway Company and being paid for as provided in said agreement.

Strawn died intestate in September, 1873, and Hinckley ceased to be a member of the Midland Construction Company some time before the death of Cushman, his interest having been transferred to Plumb. The fact seems to be unquestioned that the transaction by which the Chicago and Paducah Railroad and its extension were turned over to the Wabash Railway Company was largely beneficial to the business interests of the Midland Construction Company, and that the affairs of that company were thereby rescued from what threatened to be irretrievable insolvency. The complainant now claims, first, that upon a proper accounting and settlement of the partnership affairs and business by the surviving partners, it will appear that a large sum of money is due to the estate of Cushman as its distributive share of the assets of the copartnership, and, second, that said estate is entitled to share in the profits realized by Plumb from his construction of the railroad from Strawn to Chicago. Both of these propositions are contested by the defendants.

When Cushman's administrator entered upon the duties of his office, he found the estate insolvent. The $70,000 note executed to Cushman by his copartners, and which had never been paid, was nowhere to be found, and never came into the administrator's possession. None of Cushman's books of account later in date than 1872 were discovered. After considerable negotiations with Plumb and Shumway, he obtained from them in the spring of 1881 a statement of the assets and liabilities of the copartnership, and of the account of Cushman as a member thereof. In that account Cushman was credited with the full amount of the $70,000 note which had disap-

peared, but the statement showed a balance against Cushman of about $20,000. Plumb and Shumway thereupon offered, as a full settlement with the estate of Cushman, to cancel the indebtedness of the estate for the balance shown by the account thus rendered, and in addition thereto, to pay to the administrator the sum of $3500. This offer the administrator took into consideration, and it being apparently fair, and there being no means within his reach to show the contrary, he accepted it, and presented a petition to the County Court of La Salle county for authority to make a settlement with the surviving partners on that basis, and to release Plumb and Shumway from all liability to the estate on payment of the sum offered. Due notice of the presentation of the petition was given by publication, and on a hearing of the petition had May 21, 1881, the matter was considered by the court, and an order was entered authorizing a settlement to be made as prayed for in the petition. Plumb and Shumway then paid the administrator $3500, and the administrator, in pursuance of said order of the county court, executed to them a release and discharge of their liability to the estate growing out of the affairs of the Midland Construction Company.

The order also directed the administrator, in case of the filing of any bill for the settlement of the partnership, to consent to a decree declaring the copartnership settled and the copartners and their legal representatives discharged from all liability to each other. A bill was accordingly filed in the Circuit Court of La Salle county, to which Plumb, Shumway, Cushman's administrator, Hinckley and Strawn's administrators were made parties. To that bill the account rendered by Plumb and Shumway was attached as an exhibit. On the bill thus filed a decree was entered, Cushman's administrator consenting thereto, formally declaring a final settlement of the partnership and discharging the copartners from all liability to the estate of Cushman. That decree was entered June 21, 1881.

On the 27th day of April, 1883, Plumb and Shumway filed their answer to the complainant's amended bill in this case, in which they set up and pleaded their settlement with Cushman's administrator, and the proceedings in the county court and also the decree in the circuit court declaring the copartnership settled and discharging them from all liability to the estate of said Cushman. No attempt was made by the complainant to question the validity of said settlement and discharge until April 20, 1887, when he presented a supplemental bill and also an amended bill in which he charged, among other things, that said proceedings in the county and circuit courts of La Salle county were collusive and fraudulent.

On the 31st day of August, 1886, Lawson A. Winslow, Isaac N. Hardin and Gertrude H. Hardin, of the first part, executed under their hands and seals an agreement with Anna C. Cushman, Anna O. Glover, Susan C. Dickey and Mabel M. Cushman, of the second part, in which said parties of the first part, in consideration of $3500, released certain specific property from all claims and liens they might have upon the same, and which agreement also contained the following provisions:

"And the said parties of the first part, for and in consideration aforesaid, hereby further expressly stipulate and agree, that any and all claims filed by them or either of them in the Probate Court of La Salle county, or in the late County Court of La Salle county, Illinois, against the estate of William H. W. Cushman, deceased, shall be withdrawn and dismissed, and all proceedings for the collection thereof in said Probate Court shall be abandoned; and that no obstacles whatever shall be interposed by the said parties of the first part or either of them to the final settlement of the estate of William H. W. Cushman, deceased, in the said Probate Court of La Salle county, Illinois, and that said estate may be fully and finally settled, as in due course of administration, wholly discharged of any claim in law or equity by the said parties of the first part or either of them against the same, and hereby release

and relinquish to the said parties of the second part, for the consideration aforesaid, any claims they or either of them now have or may have, to share in the general distribution of said estate. And said parties of the first part further stipulate that a final settlement by the administrator of said estate and the distribution of the proceeds thereof, in said Probate Court of La Salle county, may be had and made, discharged of any and all claims whatsoever of the said parties of the first part, or either of them, in law or equity, to any part or parcel thereof; reserving, nevertheless, unto the said party of the first part, the right, by any proceedings now pending or which may hereafter be instituted, in any court of law or equity, to foreclose a certain mortgage given by said William H. W. Cushman and wife to Stephen V. White,   *   *   *   and also to enforce the collection of any judgment or decree or other valid claims they or either of them may have had against the said William H. W. Cushman during his lifetime, or may now have against his legal representatives since his decease, by subjecting to the payment thereof any interest which the said Cushman in his lifetime had, or which his legal representatives may now have, in any causes of action or dealings between said William H. W. Cushman and the late firm of Ralph Plumb & Company, and D. Strawn and Company, and the Midland Construction Company, and the respective railroad companies with the building of whose roads said firms were specially connected, or any such claims or causes of action so existing or which may have so existed against said Plumb, Philip B. Shumway, Francis E. Hinckley, or any or either of them for moneys or securities due or belonging to said Cushman in his lifetime, or his legal representatives since his decease, or in which they or either of them may be interested, whether heretofore proceeded for by the said parties of the first part or not : provided that in no event shall any personal judgment or decree be taken or rendered against said parties of the second part or either of them."

At the same time the foregoing instrument was executed, the persons named therein as the parties of the second part, executed to Winslow an instrument by which, in consideration of one dollar and other good and valuable considerations to them in hand paid, they sold, transferred and set over to said Winslow, all and singular their claims or causes of action growing out of the business and dealings between Cushman and the several firms above named and the railroad companies in the construction of whose roads those firms were interested, and the causes of action in favor of Cushman or his representatives against the members of said firms, and also their right to a further accounting by the members of said firms or any of them for moneys or securities belonging to said Cushman, or in which he was or might have been interested, whether theretofore proceeded for by said Winslow or not.

On the 24th day of October, 1887, a cross-bill was filed in the names of Anna C. Cushman, Susan C. Dickey, Anna O. Glover and Mabel M. Cushman, setting up substantially the same matters alleged in Winslow's supplemental and amended bills, and praying that the order of the county court and the decree of the circuit court of La Salle county be set aside, and that a receiver be appointed, and an account be taken of all of said partnership dealings, and that the amount found due from said surviving partners to the estate of Cushman, be decreed to be paid over, and that after the payment of the debts of Cushman, the shares of the complainants in the cross-bill to the surplus be paid over to them.

On the 2d day of December, 1887, Plumb and Shumway's administrators, Shumway then being dead, procured from the complainants in the cross-bill an instrument in writing, executed under their hands and seals, in which said complainants, parties of the first part, in consideration of $4000 to them in hand paid, assigned, transferred and set over to Plumb and Shumway's administrators, parties of the second part, all the right, title and interest of the parties of the first part in the

personal estate of William H. W. Cushman, deceased, and appointed the parties of the second part and their assigns, their true and lawful attorneys, irrevocable, to collect and receive their distributive share of said personal estate for the sole use of the parties of the second part, and to receipt for the same, and to execute in the name of the parties of the first part to the administrator of said estate, a release of all his liability to the parties of the first part growing out of or connected with his administration of said estate.

In pursuance of this authority, Plumb and Shumway's administrators executed to Cushman's administrator a release of all his liability to the widow and daughters of Cushman growing out of or connected with the administration of said estate, and the above agreement and the release executed thereunder were pleaded in bar of the cross-bill. Said plea being set down for argument was sustained, and no replication being filed, the cross-bill was dismissed at the hearing.

The cross-bill of Nellie Driver, which was filed April 27, 1887, attacks the settlement between Cushman's administrator and Plumb and Shumway upon the same grounds set up by Winslow in his supplemental and amended bills, and prays for an accounting, a payment of the debts of Cushman, and a final distribution. The answers to said cross-bill reaffirm the validity of the settlement, and set up laches.

The evidence tends to show that both of the cross-bills were in fact filed by Winslow, in the name of the complainants therein, but in his own interest and for his own benefit. It is also insisted by Plumb and the administrators of Shumway, that Winslow, the complainant, took the assignment of the judgments and decree set up in his bill, and holds the same really for the benefit of Hardin, and that the bill was filed and the litigation is being carried on in Hardin's interest, and the evidence to some degree supports that contention.

. The remaining facts necessary to a proper understanding of the case are sufficiently stated in the opinion of the court.

Mr. EDWARD R. SWETT, Mr. LEONARD SWETT, Mr. P. S. GROSSCUP, and Mr. F. D. WINSLOW, for the appellant:

The settlement made by Plumb and Shumway with the Cushman estate was fraudulent. An imposition was practiced upon the county and circuit courts, and a court of equity has power, in the first instance, to set aside the decree of the circuit court, which was obtained by fraud, and to award an accounting.

The right to maintain this suit was not conditioned upon the allowance of the claim in the county court. *Russell* v. *Clark's Exrs.* 7 Cranch, 71; *Miller* v. *Davidson,* 3 Gilm. 523.

Jurisdiction of trusts, and the administration of estates on account of mismanagement, is primary and original in courts of equity. Story's Eq. Jur. secs. 547, 548; Pomeroy's Eq. sec. 1152; Bispham's Eq. sec. 529; *Norsheimer* v. *Roebuck,* 23 N. J. Eq. 46; *Hogans* v. *Walker,* 14 How. 33; *Freeland* v. *Dazey,* 25 Ill. 294; *Townsend* v. *Radcliffe,* 44 id. 446; *Steere* v. *Hoagland,* 39 id. 266; *Insurance Co.* v. *Guderyahn,* 20 Bradw. 161.

Unliquidated indebtedness could not be set off against the judgments. Waterman on Set-off, sec. 347; *Swift* v. *Prouty,* 64 N. Y. 545; *Smith* v. *Briggs,* 9 Barb. 252; *Harris* v. *Palmer,* 5 id. 105.

The representative of W. H. W. Cushman can not dispute the title of complainant to the judgments. One who willfully or negligently enables another to hold himself out to the world as owner by furnishing him with the documentary evidence of title, will be estopped. Herman on Estoppel, sec. 979; *Wood's Appeal,* 92 Pa. St. 379; *Morris* v. *Preston,* 93 Ill. 215; *Tucker* v. *Conwell,* 67 id. 552.

It is not necessary that the act or declaration should have been made with a view to influence the conduct of the particular person injured. *Drew* v. *Kimball,* 43 N. H. 282; Herman on Estoppel, sec. 767.

The purchase of Hardin's interest in the several co-partnerships, by W. H. Cushman, at the time he was the owner of the judgments, does not operate in law as an extinguishment or satisfaction of such judgments.

The interest in the next of kin, in the estate of W. H. W. Cushman, was assignable.  Schouler on Personal Prop. sec. 560; 15 N. Y. 436.

It is the settled doctrine of the courts that an heir may, for a fair and adequate consideration, assign his expectation of an estate, even while the ancestor is living, from which it would seem to follow that his estate would be assignable when, upon the death of the ancestor, it became not merely an expectant, but a vested, interest.  *Bayler* v. *Commonwealth,* 40 Pa. St. 43; *Stovel* v. *Eichenheimer,* 46 Barb. 84; 3 Keyes, 620.

Mere expectancies of property are assignable.  *(Mitchel* v. *Winslow,* 2 Story, 630.)  In fact, the rule seems to be, that all interests are assignable which in case of the death of the party holding them would descend to his representative.  *Dedman* v. *Mayer,* 63 N. Y. 15; *White* v. *Thompson,* 5 id. 347; *Quinn* v. *Moore,* 15 id. 436.

Appellant has not been guilty of *laches.*

Mr. H. T. GILBERT, and Mr. EDWARD O. BROWN, for the appellees:

The judgments are satisfied, and even if not, W. H. Cushman, at the time he assigned them, had no standing in a court of equity.  *(Winans* v. *Graves,* 43 N. J. Eq. 263.)  Cushman's administrator is not estopped.

The law is well settled, that the assignee of a judgment occupies no better position than his assignor.  *(Padfield* v. *Green,* 85 Ill. 529; *Himrod* v. *Baugh,* id. 435; *Rea* v. *Forrest,* 88 id. 275; *Winans* v. *Graves,* 43 N. J. Eq. 263.)  Hence, as W. H. Cushman could not, at the time he assigned the judgments, have enforced them against either Hardin or his father by the aid of a court of equity, so neither can Winslow, unless he

can successfully establish that the administrator of W. H. W. Cushman is estopped, in some way, from insisting that the judgments are in fact paid and satisfied, or that W. H. Cushman's conduct was fraudulent.

An *estoppel in pais,* however, can only be set up as a means to prevent injustice,—as a shield, not as a sword. To conclude a party by an *estoppel in pais,* there must be on his part a fraudulent purpose, or his acts must produce a fraudulent result, and there must be a change of conduct, induced by the acts of the party sought to be estopped, to the injury of another. If the element of fraud or injury is, wanting, there can be no estoppel. *Thomas* v. *Bowman,* 29 Ill. 426; *Davidson* v. *Young,* 38 id. 145; *Flower* v. *Elwood,* 66 id. 447; *Railroad Co.* v. *Shunick,* 65 id. 223.

Winslow's bill can not be maintained because his claim has never been allowed by the probate court. As assignee of the judgments against Cushman, he occupies no better position than that of a simple contract creditor. In the distribution of the assets of deceased persons, judgment creditors without a lien, and contract creditors, are put upon the same footing. Before any of the assets of the estate can be applied toward their payment, their claims must be presented to and allowed by the probate court as valid claims. In this they differ from judgments rendered in the circuit court against an administrator, which require no allowance by the probate court. *Turney* v. *Gates,* 12 Ill. 142; *Paschall* v. *Hailman,* 4 Gilm. 285; *Reitzell* v. *Miller,* 25 Ill. 67; *Clingman* v. *Hopkie,* 78 id. 155; *People* v. *Allen,* 8 Bradw. 21.

Even if the object of Winslow's bill were to impeach a fraudulent transaction of William H. W. Cushman in his lifetime, or, in other words, to reach assets that could not be reached by the administrator, it would nevertheless not lie, because Winslow's claim has never been allowed by the probate court. *Blanchard* v. *Williamson,* 70 Ill. 651; *White* v. *Russell,* 79 id. 155; *Hall* v. *Black Bros.* 21 Bradw. 294; *Scripps* v. *King,* 103

Ill. 469; *Estes* v. *Wilcox,* 67 N. Y. 264; *Dormueil* v. *Ward,* 108 id. 216; *Gore* v. *Kramer,* 117 id. 176.

Winslow is barred of relief by his contract of August 31, 1886, with Anna C. Cushman and daughters.    He is barred of equitable relief by *laches.*

The law of *laches,* as applicable to the case at bar, is clearly laid down in the following cases: *Harwood* v. *Railroad Co.* 17 Wall. 81; *Badger* v. *Badger,* 2 id. 95; *Brown* v. *County of Buena Vista,* 95 U. S. 157; *Wood* v. *Carpenter,* 101 id. 140; *Propeller "Mohawk,"* 8 Wall. 162; Story's Eq. Jur. sec. 529.

An executor or administrator may dispose of the personal estate, and may assign a promissory note payable to his intestate.    (*McConnell* v. *Hodson,* 2 Gilm. 640; *Makepeace* v. *Moore,* 5 id. 474.)    He also has power to compromise a suit brought to recover damages for the death of his testate or intestate.    *Henchey* v. *City of Chicago,* 41 Ill. 136.


Mr. JUSTICE BAILEY delivered the opinion of the Court:

The record in this case is voluminous and complicated, and various questions, both of fact and of law, have been presented and elaborately argued.    Without attempting to travel over the entire ground covered by counsel in their briefs, we shall content ourselves with a consideration of those questions only which seem to us to be decisive of the case.    We have reached the conclusion that the judgment of the Appellate Court should be affirmed, and such affirmance may, in our opinion, be placed upon either one of several distinct grounds.

The first point made is, that the judgments and decree upon which the complainant's bill is based have been satisfied, or at least, that they have been so dealt with by the parties as to be no longer available as evidence of a subsisting claim against the estate of William H. W. Cushman, deceased.    This point involves the contention, first, that when said judgments and decree were purchased by William H. Cushman, such pur-

chases were made for the benefit and with the money of William H. W. Cushman, and, second, that if the money used in fact belonged to William H. Cushman, his subsequent transactions with Isaac N. Hardin, who was jointly liable with William H. W. Cushman on said judgments and decree, resulted in a satisfaction of the indebtedness evidenced thereby, or at least, should be held to estop William H. Cushman and his assignee from attempting to enforce them as against either debtor.

Whether the money expended in the purchase of the judgments and decree was really the money of William H. Cushman or of his father is a question of fact upon which the evidence is conflicting. The chancellor before whom the cause was heard having found the issues in favor of the defendants, it will be presumed, in support of his decree, that upon this proposition the conflict was resolved in their favor. Unless, therefore, we are able to see that the preponderance of the evidence is clearly the other way, the finding of the chancellor should not be disturbed.

The principal witness upon this matter was William H. Cushman himself, and the difficulty grows out of the fact that, being examined on two different occasions, he gave evidence on this point which, apparently at least, is conflicting. The first occasion was when he was examined as a witness before the arbitrators chosen to appraise Hardin's interest in the assets of the firms in which he was a copartner with William H. W. Cushman. On the second occasion he was called as a witness in the matter of a creditor's bill brought by the complainant in this case by which he was endeavoring to reach the moneys payable on the policies of insurance on the life of William H. W. Cushman and apply the same to the satisfaction of said judgments and decree. On both occasions his testimony shows that the actual transactions by which the judgments and decree were purchased were carried on partly by himself and partly by his father. Before the arbitrators, his testimony

was to the effect that he furnished all the money used both by his father and himself, the money used by his father being furnished by him, partly by remittances and partly by paying drafts drawn on him by his father, and that the purchases were all made for the witness' benefit. When examined as a witness in the matter of the creditor's bill, he testified that the purchases were made in the interest and for the benefit of his father; that the money was furnished partly by himself and partly by his father; that there was a running account between them, and that he received on his account with his father, credit for whatever sums he paid in making said purchases. William H. W. Cushman was also examined as a witness before the arbitrators, and his testimony, though not very explicit, is to the effect that his son frequently furnished him money to buy the judgments, and that he had them assigned to his son as security for his advances, and that said advances were not made as a matter of personal accommodation upon a general account between himself and his son.

It should be observed that, in the matter pending before the arbitrators, the question whether the money of William H. Cushman or of his father had been used in the purchase of the judgments, or whether the judgments had been paid and satisfied or not, was of very little materiality. The arbitrators were seeking to ascertain the net value of Hardin's interest in the assets of the firms of which he was a member, and in the accounting by which such value was to be arrived at, Hardin was liable to be charged with his proportionate share of said judgments, whether the transaction by which they had been taken up by the Cushmans was in fact a purchase or a payment.

There is only this view in which the question could be material. If the judgments were satisfied, Hardin was chargeable with only his proportionate share of the money actually expended in paying them, but if they had been purchased by William H. Cushman and were held by him adversely to the

defendants therein, he was entitled in the statement of the account, to have Hardin charged with his proportionate share of the full amount of the judgments and decree. It seems however that William H. Cushman claimed only to have Hardin charged with his proportionate share of the money actually paid, and that the account was stated by the arbitrators on that basis. The decree was bought in for only about twenty per cent of its face, and only Hardin's proportionate share of that sum was charged against him. This circumstance of itself tends strongly to support the view that the judgments and decree were taken up in the interest and for the benefit of William H. W. Cushman, for if his son in fact bought them with his own money and for his own benefit, no reason is shown why he should be willing to accept a credit for only Hardin's share of the money actually paid, instead of charging Hardin with his share of the full amount due.

The question as to whose money was used not being material in the arbitration matter and arising there only incidentally, was not carefully investigated, and the witnesses were not fully examined in relation thereto. In the matter of the creditor's bill, however, the question as to whether the judgments and decree had been satisfied was directly in issue, and there William H. Cushman seems to have been questioned more fully, and he there disclosed a fact upon which neither he nor his father seems to have been interrogated on the former occasion, viz., that in the adjustment of accounts between him and his father, he had received credit for all the moneys expended by him in the purchase of the judgments and decree. Upon this one point he is nowhere contradicted, and if his statement is true, it is of little consequence who furnished the money in the first instance, or whether the intention of the parties at the time the purchases were made was that William H. Cushman should take and hold the judgments and decree for his own benefit, or as security for the money advanced. If he ultimately received credit from his father for said money, his in-

terest in the judgments and decree was thenceforward precisely the same as though the purchases had been originally made by his father with his own money and for his own benefit. We are unable to say therefore that the question of fact here presented was incorrectly decided.

But even if William H. Cushman is to be treated as having purchased said judgments and decree with his own money and with a view of holding them adversely to his father and Hardin, how are his rights affected by his subsequent dealings with Hardin? By his contract with Hardin under which the arbitration was had, he agreed to purchase Hardin's interest in the assets of the two firms of which William H. W. Cushman and Hardin were members, paying him therefor a price to be fixed by arbitrators. It was also agreed that in making the appraisement Hardin should be charged with his proportionate share of the liabilities of the two firms, and that William H. Cushman should assume his share of said liabilities and save him harmless therefrom. It is not disputed that the indebtedness for which the several judgments and the decree in question, except perhaps the two judgments rendered against Cushman alone, constituted a part of the liabilities of said firms, of which Hardin's proportion was to be and was in fact charged against him, and which William H. Cushman agreed to assume and protect Hardin against. Can it be doubted that charging against Hardin his proportionate share of said judgments and decree, coupled with William H. Cushman's agreements to assume Hardin's liability thereon and to keep him harmless therefrom, operated, between them, as a satisfaction and discharge of the judgments and decree? Upon what principle could William H. Cushman have been permitted afterwards to enforce said judgments or decree against Hardin? Manifestly as to him these transactions operated as a complete discharge and satisfaction, and if the judgments and decree were satisfied as to Hardin, they were equally so as to Cushman the other joint debtor.

But it is said that because William H. Cushman, during the pendency of the arbitration proceedings, and in violation of his agreement with Hardin, assigned said judgments and decree as collateral security for certain indebtedness, his assignees are entitled to hold and enforce them unaffected by the settlement with Hardin. To this view we are unable to assent. Judgments and decrees are not commercial paper, and assignees of such securities take them affected with all equities and defenses which might be set up against them in the hands of the assignor. At the time Cushman assigned these securities, his contract with Hardin was in force and was in process of execution, and Hardin had a right to satisfy and discharge them in the mode provided for in the agreement. Such right could not be divested by any act of Cushman. Hardin having performed the contract on his part, the judgments and decree became satisfied as to him, and he was thereby discharged from liability thereon, and his discharge is also available on behalf of his co-debtor.

An attempt is made to invoke as against William H. W. Cushman and his representative the doctrine of equitable estoppel. It is said that he consented to the assignment of the judgments and decree by his son, and was in fact a party to such assignment, and that he and his representative should therefore be precluded from denying the validity of said securities in the hands of the assignee. Without pausing to consider how far the doctrine of estoppel would apply if the facts were as the complainant supposes, it is sufficient to say, that as we read the record, the evidence fails to show that William H. W. Cushman was a party to the assignment, or that he was aware that it had been made. True, his name appears as guarantor upon the notes given by his son for the money borrowed from White, but it appears affirmatively that he had no personal communication with White, and we find no evidence that he had any knowledge as to what collaterals his son pledged to White as security for said notes.

22—128 ILL.

On the whole case then we are of the opinion that the chancellor was justified in holding that the judgments and decree had been satisfied, and that they no longer constituted an indebtedness or claim against the estate of William H. W. Cushman, deceased.

It may further be questioned whether, upon the face of his bill, the complainant has made out a case which entitles him to relief in a court of equity. The bill is in the nature of a creditor's bill. It is brought by the complainant as the assignee of nine judgments at law and a money decree in equity, recovered by various plaintiffs, against William H. W. Cushman, in his lifetime. Of the nine judgments at law, five were recovered in the Circuit Court of the United States for the Northern District of Illinois. The other four were recovered in the Superior Court of Cook county, and upon those four judgments executions had been duly issued and returned unsatisfied in the lifetime of Cushman. The decree awarded execution, but it is not claimed that any execution was ever issued for its collection.

The judgments of the federal court, that being a court of another jurisdiction, can not be made the basis of a creditor's bill in a State court. *Steere* v. *Hoagland*, 39 Ill. 264. Nor will a creditor's bill, properly so called, lie for the collection of the decree, no execution having been returned unsatisfied. In this respect a money decree in equity stands upon the same footing as a judgment at law. *Weightman* v. *Hatch*, 17 Ill. 281 ; *Farnsworth* v. *Strasler*, 12 id. 482. The general rule, subject it is true to a very few exceptions, is, that before a bill can be filed to reach equitable assets, the creditor must first recover a judgment at law, or what in a proper case would be its equivalent, a money decree in equity, and have an execution issued and returned unsatisfied. This is a rule so well established as to require no citation of authorities. So far then as the five judgments recovered in the federal court and the decree in chancery are concerned, the complainant has no equities

superior to those of a simple contract creditor, and as to that portion of his demand his bill must necessarily fail, unless he has brought his case within some one of the recognized exceptions to the general rule.

How is it with the judgments recovered in the Superior Court? There can be no doubt that, as against Cushman, so far as those judgments are concerned, the creditor must be deemed to have exhausted his legal remedies. Had Cushman been living therefore, a creditor's bill might unquestionably have been brought against him upon those judgments, assuming of course that they had not been paid or otherwise satisfied. The bill as filed seeks to reach personal assets only, and at the time it was filed, Cushman had been dead and his administrator had been appointed more than two years, and his estate was in process of administration. No charge is made of any fraud committed by Cushman in his lifetime, and the personal assets sought to be reached are not such as had been fraudulently disposed of by Cushman, but which, if they exist at all, are within the reach of his administrator, and are assets which it was within the power and was the duty of his administrator to collect and distribute.

Can it be said, as the case now stands, that the complainant has exhausted his legal remedies? Remedies which might have been pursued in the lifetime of Cushman were extinguished by his death, and a new class of legal rights and remedies was created. His personal estate is no longer liable to be seized upon execution, but creditors are given the right, upon exhibiting and establishing their claims in the county court, to share in the distribution of his personal estate.

Not only is it true that when a debtor dies, the law gives new legal remedies against his representatives, but the rule is imperative that, to entitle a creditor to share in the distribution of his estate, those remedies must be pursued. A creditor of a deceased person must exhibit and prove his claim in the county court before he can be entitled to payment. *Reitzell* v.

*Miller,* 25 Ill. 67. And in this respect, judgment creditors, except so far as their judgments are liens on real estate, and simple contract creditors, stand upon the same footing. *Paschall* v. *Hailman,* 4 Gilm. 285; *Turney* v. *Gates,* 12 Ill. 141; *Clingman* v. *Hopkie,* 78 id. 152. It is difficult then to see how the mere fact that a creditor has exhausted his legal remedies against his debtor while living, can furnish a sufficient ground for proceeding by creditor's bill to reach personal estate while the administration is in progress, especially where no fraud is charged against the intestate, and the only scope of the bill is, to seek a remedy against the fraud or failure of duty of the administrator himself, and to reach property which the administrator is entitled to but which he has failed to get into his possession.

In *Harris* v. *Douglas,* 64 Ill. 466, this court said: "A court of equity will not assume jurisdiction, except in extraordinary cases where the remedy afforded by the statute is inadequate. It is for the very plain reason that the statute had pointed out a different mode, and the party must pursue the remedy provided by law. By the provisions of the Statute of Wills, claims against the estate are to be classified, and some are to be paid in full and others *pro rata.* A claimant can not avoid this statute by resorting to equity. The law is settled, in this State at least, that a court of equity will not ordinarily assume jurisdiction until the claimant shall have exhibited his claim and had it allowed in the county court, and then, if any special reasons, that may be deemed sufficient, can be assigned, why that court can not afford the requisite relief, equity will assist him, but not otherwise." The doctrine here stated was reaffirmed in *Blanchard* v. *Williamson,* 70 Ill. 647.

The bill alleges that the complainant, within two years after letters of administration were issued, exhibited in the county court of La Salle county his claim against the estate of Cushman upon all of said judgments and upon said decree, and caused proceedings to be commenced in said court for its al-

lowance, but there is no averment that it was proved up and allowed, and the evidence shows that said proceedings, after remaining pending and undetermined for about five years, were dismissed by the county court on its own motion for want of prosecution.

The complainant's position seems to be, that his bill makes a case within one of the recognized exceptions to the rule requiring an exhaustion of his legal remedies before resorting to a court of equity for relief. The exception relied upon is plainly the one under which courts of equity will, in extraordinary cases, take upon themselves the administration of estates. The bill purports to be filed on behalf of the complainant and on behalf of such others of the creditors of Cushman as might choose to come in and bear their proportionate share of the expenses of the litigation. After alleging the recovery of said judgments and decree, the issuing and return of executions so far as executions were issued, the proceedings by which said judgments and decree were assigned to and became the property of the complainant, the death of Cushman and the appointment of his administrator, the bill alleges, in substance, that Cushman left large equitable interests and concealed assets which the administrator made no effort to reduce to possession; that the administrator and heirs were colluding together with divers other persons to defraud the creditors of the estate out of their just demands; that Cushman at his death left large assets in the hands of surviving partners, which they were wilfully and fraudulently seeking to convert to their own use, claiming that nothing was due therefrom to the estate of Cushman, and that they had disposed of a large amount of said assets, realizing a large profit therefrom. The bill prays for answers under oath, and a discovery of all property, interests and effects of said Cushman, or of which he was possessed or in which he was in any way interested at the time of his death, and not already disposed of by his administrator in due course of administration; and

for the appointment of a receiver to receive all of said assets, and manage and dispose of the same as the court should direct, and apply the proceeds to the payment of the complainant's claim, and the claims of such other creditors of said estate as should be entitled to a participation therein.

The evident purpose and scope of the bill is, to induce the court in which it was filed to take upon itself the administration of the estate of Cushman, so far as it had not already been administered upon, and thus supersede the jurisdiction of the county court. The court is asked to take possession of the remaining assets of the intestate through the instrumentality of a receiver, and distribute the same or the proceeds thereof to those entitled thereto. This is of the very essence of the administration of an intestate estate. If it be said that the real purpose of the bill is to draw to the court of chancery the administration of the estate only as to certain specified assets, viz., the interest of the intestate in the assets of the partnership of which he was a member, the answer is, that when a court of equity takes upon itself the administration of an estate at all, it will take the whole administration into its hands. *Freeland* v. *Dazey*, 25 Ill. 294.

A court of chancery may, in the exercise of its general jurisdiction, take upon itself the administration of an estate, but it has been frequently held that it will not do so except in extraordinary cases. (*Freeland* v. *Dazey, supra; Heustis* v. *Johnson,* 84 Ill. 61; *Cowdrey* v. *Hitchcock,* 103 id. 262; *Harris* v. *Douglas, supra.*) Is such a case made out by the bill? The allegation is merely that the conduct of the administrator had been negligent and fraudulent, but no reason is assigned why the ordinary powers of the county court are not adequate to the protection of all the complainant's rights. It is not shown that the interposition of that court has been asked for, or that the alleged misconduct of its administrator has been in any way brought to its attention. The county court has ample power to compel an administrator to proceed properly and

faithfully in the discharge of his duties. If he has made mistakes it has power to correct them. If he has been guilty of fraud, or has wasted the estate, or has shown himself incompetent, or an improper person to conduct the administration, the court has power to call him to account, or to remove him and appoint another and suitable person in his place. If the administrator in this case has failed or refused, either negligently or fraudulently, to call Cushman's surviving partners to an account, or has made a collusive settlement with them, the court has ample power to apply the proper remedy. It does not appear, however, that such power has been in any way invoked.

In *Freeland* v. *Dazey*, the misconduct charged upon the administrator was, the neglect to file an inventory whereby the estate had been wasted, and neglecting and refusing to settle the estate. The court, in holding that chancery should not take jurisdiction in such case, adopted as a test, the fact that it did not appear that the ordinary powers of the probate court were inadequate to the protection of all the complainant's rights. In *Heustis* v. *Johnson*, the bill charged that the executor had failed to discharge his duties promptly, and had by divers plausible devices, excused himself from properly accounting, when he ought long before to have made a final settlement of the estate. It was held that there was no jurisdiction for the reason that the county court had full power to grant relief in the case made by the bill. In *Harris* v. *Douglas*, it was held, in the language already quoted, that a court of equity will take jurisdiction only where "special reasons, that may be deemed sufficient, can be assigned, why that court (the county court) can not afford the requisite relief."

We are also of the opinion that the complainant effectually released his right to have his judgments and decree satisfied out of the personal assets of the Cushman estate, by the instrument dated August 31, 1886, executed by the complainant, Isaac N. Hardin and Gertrude H. Hardin, to the widow and

surviving children of said Cushman. That instrument recited a consideration of $3500, and was executed under the hands and seals of the parties of the first part. By it said parties of the first part agreed, that any and all claims filed by them or either of them in the county court of La Salle county against the estate of Cushman should be withdrawn and dismissed, and all proceedings for the collection thereof in that court abandoned; that no obstacles whatever should be interposed by said parties or either of them to the final settlement of said estate in said court, and that said estate might be fully and finally settled, as in due course of administration, wholly discharged of any claim, in law or equity, by said parties or either of them, against the same, and they thereby released and relinquished to said widow and surviving children of Cushman any claims they or either of them had or might have to share in the general distribution of said estate. And said parties further stipulated that a final settlement by the administrator of said estate, and the distribution of the assets thereof by said court, might be had and made, discharged of any and all claims whatsoever of said parties or either of them, in law or equity, to any part or portion thereof. It is true, a reservation was made or attempted to be made by the complainant and the Hardins, of the right, by any proceedings then pending or thereafter to be instituted, to enforce the collection of any judgment or decree or other valid claim they or either of them may have had against Cushman in his lifetime, or against his legal representatives, by subjecting to the payment thereof any interest which Cushman in his lifetime had or his legal representatives then had, in any causes of action or dealings between Cushman and the firms of which he had been a member, or the railroad companies with the building of whose roads said firms had been specially connected, or any claims or causes of action which may have existed in favor of Cushman against Plumb, Shumway and Hinckley or either of them.

The remedy by which the creditors of an intestate may subject the personal estate of their deceased debtor to the payment of their claims, is by due course of administration. As to all personal assets which are legally within the reach of the administrator, and upon which the creditor has obtained no lien during the lifetime of his debtor, this remedy is exclusive. The rule may be otherwise in case of assets fraudulently disposed of by the intestate in his lifetime. All personal assets as to which the intestate was himself in a position to assert title at the time of his decease, pass to the administrator, and it is through him alone that creditors must seek to have them subjected to the payment of their debts. It follows then that a covenant by a creditor, that all proceedings for the collection of his debt through the instrumentality of the administration shall be abandoned; that the estate may be finally settled, and final distribution made wholly discharged of his claim, and releasing and relinquishing to the widow and heirs of the intestate any claim he might have to share in such distribution, is in effect a complete abandonment and release of all legal claim to have his debt satisfied out of any personal estate which the administrator has reduced to possession, or to which he was entitled as administrator.

The complainant does not seek by his bill to reach any property not assets of the estate of Cushman. The existence of no property is alleged which the administrator could not and ought not to have taken into his possession. If it be true, as the bill charges, that he failed to discharge his duty, either through negligence or fraud, the nature of the assets which the bill seeks to reach is in no way changed. Ample power to compel their collection and distribution resided in the county court, and that is the tribunal to which the law had committed the jurisdiction in matters of administration. The complainant then by renouncing and abandoning his right to reach said assets through process of administration, must be held to have

abandoned the only remedy the law gave him, and to have placed said property wholly beyond the reach of his claim.

Nor can it avail him that a reservation was made by the same instrument of the right, by other proceedings, then pending or thereafter to be instituted, to enforce the collection out of Cushman's interest in the assets of the firms of which he was a member at the time of his death. That interest could be reached by him by due course of administration and not otherwise, and the reservation was therefore nugatory.

Nor can it be seen that the complainant obtained any rights by virtue of the instrument executed to him by the widow and children of Cushman of the same date with the instrument last above mentioned. By that instrument said widow and children transferred and set over to the complainant all their claims and causes of action growing out of the business and dealings between Cushman and the several firms with which he had been connected, and also their right to a further accounting with the members of said firms, for moneys or securities belonging to Cushman. The fact being that all rights and causes of action growing out of Cushman's dealings with said firms, and the right to an accounting with the surviving members of said firms, were vested in the administrator and not in the widow and children of Cushman, there were no rights or interests of that character which said widow and heirs could assign to the complainant. That they have an assignable interest in their distributive share of the assets of the estate after the payment of debts need not be questioned, but that was an interest wholly distinct from an interest in specific chattels upon which no administration had been had. As to the latter they had no interest susceptible of assignment, the entire ownership, for all the purposes of administration, being vested in the administrator.

But even if this were otherwise, it can scarcely be questioned that the widow and children of Cushman had lost, by their laches, all right to demand a further accounting from Cush-

man's surviving partners, at the time they undertook to assign such right to the complainant. The evidence shows that an accounting and settlement were had between the administrator and said surviving partners, which were approved by the county court of LaSalle county by a formal order entered in that court May 21, 1881, and that upon a bill filed in the circuit court of said county, based upon such accounting and settlement, a decree was entered June 21, 1881, formally declaring a final settlement of said partnerships and discharging said partners from all liability to the estate of Cushman. This order and decree remained unchallenged, in any form, by either the widow and children of Cushman or any one else, up to the time said widow and children attempted to transfer their right to such accounting, although something over five years had elapsed. No explanation of this delay is attempted, nor does the complainant attempt to explain his own delay for nearly one year after said assignment to him, to attack or call in question the order and decree of the county and circuit courts of La Salle county, or the accounting and settlement upon which they were based. After an unexplained delay covering a period of nearly six years in all, during which one of the surviving partners has died, the situation of the others has materially changed, and more or less of the evidence by which the true state of the accounts of said firms could be established has disappeared, it should be held, we think, that the widow and children of Cushman, and their assignee, should be barred by their laches of their right to attack said accounting and settlement as fraudulent.

The demurrer to the supplemental bill was properly sustained. That bill was filed for the purpose of setting up the interest obtained by the complainant, through the assignment to him from Mrs. Cushman and her daughters, in the assets of the firms of which Cushman was a member. As no interest capable of being asserted either at law or in equity passed to him by the assignment, he had no newly acquired interest

which could be made the basis of a supplemental bill. Said bill also attacks the accounting and settlement of 1881, on the ground of fraud, but in no way attempts to excuse or account for the delay of nearly six years, during which the order and decree founded on said settlement and judicially confirming the same had in no way been called in question.

The cross-bill filed by Mrs. Cushman and her daughter, was properly dismissed. That bill was filed October 24, 1887, and attacked the settlement of 1881 on the same ground set up in Winslow's supplemental bill. No attempt was made to excuse laches, and for that reason the bill was insufficient. But by an instrument executed by the complainants in the cross-bill to Plumb and the administrators of Shumway, dated December 2, 1881, said complainants, for a valuable consideration, assigned to Plumb and said administrators, all their interest in the personal estate of Cushman, deceased, and appointed Plumb and the administrators of Shumway their attorneys, irrevocably, to collect and receive their distributive share of said personal estate, and in their names to execute to the administrator of Cushman a release of all his liability to them. Under this power Plumb and the administrators of Shumway · executed such release, and the assignment, the warrant of attorney, and the release executed thereunder, being set up by plea to the cross-bill, the plea was held sufficient, and no further attempt was made by the complainants in the cross-bill to litigate the matters thus presented.

We are unable to see that any error was committed by the order of the court dismissing the cross-bill of Nellie Driver. The complainant in that bill was the administratrix of a deceased son of Cushman, and said bill was filed April 27, 1887, and seeks to set aside the settlement of 1881, and the order and decree of the courts of La Salle county confirming the same, alleging the same grounds for such relief as were set up in Winslow's supplemental bill. Here, as in the other bills, no attempt is made to excuse laches, although said order and

decree had been in full force and unquestioned for about six years. The time within which the decree could have been reviewed on error had long since elapsed. It was incumbent upon all parties bound by the decree, if they desired to attack it on the ground of fraud, to do so in apt time, and a delay of nearly six years, unexplained, must manifestly be held to be sufficient to bar relief.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*